IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

GORDON LYNN MARTIN, )
)
        Plaintiff, )
)
vs. ) Case No. 17-cv-278-JPG-CJP
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
        Defendant.[1] )

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Gordon Lynn Martin seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff filed for DIB on December 22, 2015, alleging a disability onset date of September 3, 1992. (Tr. 1380-41.) Plaintiff's claim was denied initially and again upon reconsideration. (Tr. 54-59, 61-68.) Plaintiff requested an evidentiary hearing, which Administrative Law Judge (ALJ) Michael Scurry conducted on October 19, 2016. Following the hearing, ALJ Scurry issued an unfavorable decision in November 2016. (Tr. 19-27.) The Appeals Council denied review, making the ALJ's decision the final agency's decision. (Tr. 1-6.) Plaintiff exhausted his administrative remedies and filed a timely complaint with this Court. (Doc. 1.)

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*,

55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework set forth above. He determined plaintiff last met the insured status requirements on December 31, 1997, and had not engaged in substantial gainful activity from the alleged onset date through his date last insured. ALJ Scurry opined plaintiff had severe impairments of restrictive lung disease with history of emphysema and tracheostomy; and interstitial pulmonary fibrosis. (Tr. 21.) He determined plaintiff had the RFC to perform sedentary work and was not disabled because he was capable of performing jobs that existed in the national economy. (Tr. 23-27.)

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff alleged that COPD, hip replacements, manic depression, and schizoaffective disorder limited his ability to work. (Tr. 165.) In a function report dated January 2016, he stated he could not walk more than 100 yards without taking a break to catch his breath. Plaintiff was on three liters of oxygen when walking and sleeping. He was unable to stand for long periods due to his hip replacements. (Tr. 187.)

2. **Evidentiary Hearing**

ALJ Scurry conducted an evidentiary hearing on October 19, 2016, during which plaintiff was represented by counsel. (Tr. 32-53.) Plaintiff was forty-seven years old at the time of the hearing. (Tr. 37.) He had five children, ages twenty-eight, twenty-five, twenty, nineteen, and seventeen. (Tr. 39.)

In 1992, plaintiff joined the military and went to Georgia for boot camp in August. A week into boot camp, plaintiff had an abscessed tooth pulled. He was not given antibiotics and the abscess entered his blood system and spread throughout his body. Initially, plaintiff could not open his mouth, and his neck started swelling. The next two and a half months were a "blur" because plaintiff was sedated and had multiple operations. Plaintiff transferred to a Veterans Administration (VA) hospital in Indiana for another four and a half months. At the end of his hospitalization, he learned to walk again and to breathe and eat with a trach. His rehabilitation therapy ended in March 1993 and he moved in with his parents because he could not walk correctly. (Tr. 41-43.)

Plaintiff moved out of his parents' house in September 1993. At this time, plaintiff moved slowly and became short of breath when he walked. His son could walk but plaintiff

sometimes had to carry his son a short distance. Plaintiff had to sit down to catch his breath afterwards. (Tr. 44.)

In December 2014, plaintiff underwent a pulmonary test and his oxygen level dropped to eight-eight. Consequentially, the VA prescribed plaintiff portable oxygen for walking and sleeping. (Tr. 45-46.)

Every month for about forty-five minutes, plaintiff volunteered at a home for the mentally disabled. He talked to patients and advocated for them if they reported any problems. (Tr. 46-47.) In 2013, plaintiff volunteered as the secretary of a high school band, which entailed recording minutes at monthly parent meetings. The meetings lasted about a half an hour. Plaintiff quit the following year. (Tr. 47-48.)

Since 1992, plaintiff did not apply to any jobs because he would need to take constant breaks and sit all day. He could only walk a block before he needed to stop for a few minutes to catch his breath. Standing was not too difficult, but he could not lift or carry anything. If plaintiff worked as a secretary, he would probably not require extra breaks. However, plaintiff had good days and bad days. On a bad day, he stayed at home and would not be able to work, even as a secretary. Humidity made it difficult for plaintiff to breath. He expected to require constant oxygen within the following two years. (Tr. 48-51.)

### 3. Medical Records

While in basic training in August 1992, plaintiff had a tooth extraction that developed an abscess. The abscess spread to plaintiff's pharyngeal space and neck, which required intubation for several days, as well as incision and drainage of his neck. Plaintiff subsequently developed pericarditis and pericardial effusion, as well as mediastinitis and pneumonitis with bilateral empyemas. Plaintiff underwent a tracheostomy, drainage of the neck abscesses and

6

mediastinum, bilateral chest tube placement, and a left thoracotomy with pericardial window. He remained on a ventilator and intravenous antibiotics for several weeks.

In October 1992, plaintiff had difficulty swallowing, which resulted in an exploratory laparotomy. He also had an esophagogastrodudenoscopy and a percutaneous gastrostomy tube placed.

In November 1992, Plaintiff transferred to the Indianapolis VA Medical Center for extensive rehabilitation, which was closer to his home in Southern Illinois. (Tr. 605.) Plaintiff's physicians noted bilateral pleural effusions, a persistent tachycardia, gastroparesis, and peripheral neuropathy. He also experienced persistent nausea and vomiting and poor PO$^2$ intake, as well as decortication of the right lung, secondary to empyema.

In December 1992, a Hickman catheter was placed for central hyperalimentation and long-term IV antibiotic therapy. Plaintiff had an episode of mild pancreatitis.

In January 1993, an upper endoscopy was performed and plaintiff began Omeprazole. His pancreatitis resolved.

In February 1993, plaintiff was positive for pseudomonas and methicillin. Plaintiff's doctors believed the Hickmann catheter was the source and discontinued it. That same month, plaintiff had an episode of tachypnea and pleuritic chest pain and was transferred to the intensive care unit (ICU) to rule out a pulmonary embolism. A ventilation perfusion showed a low probability scan and an angiogram was negative. Plaintiff transferred out of the ICU and a right subclavian triple lumen catheter was subsequently placed for continued hyperalimentation.

On February 9, 1993, plaintiff underwent a tracheostomy. (Tr. 606.) Following a temperature spike, a chest computed tomography showed loculated pleural fluid. A thoracentesis

---

[2] "PO" stands for "per os," or "by mouth." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (32d ed. 2012).

was performed that revealed thick purulent frank puss with many white blood cells. Plaintiff's antibiotics were broadened and a pigtail-type chest tube was placed. Plaintiff underwent several days of every-other-day urokinase infusions in the chest cavity with subsequent drainage of the purulent material. Follow-up sonograms showed improvement in the size of the pocket in the right lung, as well as decreased pleural thickening.

In March 1993, plaintiff was discharged with active diagnoses of severe pulmonary restrictive disease secondary to pulmonary fibrosis, as a result of extensive empyemas requiring decortication; and erosive gastritis. He had a small pigtail chest tube placed in his right chest. (Tr. 607.)

Early in his hospitalization, plaintiff did not tolerate oral intake or J-tube[3] feedings without vomiting. Slowly, over a two to three week period, plaintiff began tolerating small amounts of oral feedings and J-tube bolus feedings. He eventually advanced to an oral diet with continued J-tube bolus feedings at mealtimes. He eventually tolerated a liquid diet, then graduated to a regular diet without nausea and vomiting. Plaintiff's J-tube was eventually discontinued per surgery. (Tr. 605-06.)

Plaintiff underwent physical therapy during his hospitalization and progressed to an ambulatory status, which was limited by pulmonary function. He also complained of depression, insomnia, and decreased appetite. Plaintiff began Tricyclic antidepressant therapy following a psychiatric evaluation. His mood improved and his sleep, appetite, and PO intake gradually improved as well. (Tr. 607.)

---

[3] "A jejunostomy tube (J-tube) is a soft, plastic tube placed through the skin of the abdomen into the midsection of the small intestine. The tube delivers food and medicine until the person is healthy enough to eat by mouth." *Medical Encyclopedia*, MEDLINEPLUS, https://medlineplus.gov/ency/patientinstructions/000181.htm (visited Oct. 18, 2017).

In March 1993, a CT of plaintiff's chest showed: an interval decrease in right loculated pleural fluid; a right pigtail catheter in the pleural space; an interval decrease in bilateral atelectasis and infiltrated with a marked decreased in bilateral pleural thickening; decreased stranding in the mediastinum; and gallbladder wall thickening with a trace amount of fluid. (Tr. 280-81.)

Plaintiff also underwent a pulmonary function test in March 1993, which demonstrated a forced vital capacity of .92 and a forced expiratory volume -1 of .90, with results showing severe restrictive ventilator defect. (Tr. 604.)

In a letter dated April 25, 1994, Dr. Daniel Belcher stated plaintiff was under his care during plaintiff's extensive hospitalization at the Indianapolis VA Medical Center. Plaintiff continued to follow-up with Dr. Belcher in the medicine clinic on a regular basic. Dr. Belcher opined plaintiff was "doing relatively well." His primary medical problem was chronic interstitial pulmonary fibrosis and pleural thickening, which compromised plaintiff's respiratory status. Dr. Belcher also wrote plaintiff was coping with his limited respiratory status and was active and able to perform activities of daily living (ADLs). Exercise and physical exertion were somewhat limited. Plaintiff's condition was stabilized, but he would have a permanent disability with respect to his pulmonary status. Moreover, his respiratory status was significantly reduced. He could walk about one block and run for one minute. If he did so slowly, plaintiff could walk up to several blocks. He had a normal appetite. On physical exam, his chest was clear to auscultation with diffusely reduced breath sounds. A cardiac exam was regular and his abdomen and chest showed well-healed scars. (Tr. 610-11.)

In August 1993, images of plaintiff's chest demonstrated no acute infiltrates and chronic pleural thickening. (Tr. 277.)

In August 1994, the Physical Disability Branch determined plaintiff was 100% disabled. (Tr. 613.)

In September 1994, plaintiff chest x-rays showed pleural parenchymal thickening on the right lateral chest wall, with no focal active disease. (Tr. 276.)

In July 1996, plaintiff received a chest x-ray, which revealed stable, right pleural thickening. (Tr. 273.) Further x-rays demonstrated mild degenerative joint disease of his right hip. (Tr. 276.)

On February 2, 2016, Dr. Howard Tin reviewed plaintiff's records for a psychiatric review technique and determined there was insufficient evidence to make a determination prior to the date last insured. Dr. Michael Nenaber was consulted as well and determined there was insufficient evidence prior to the date last insured to establish the severity of plaintiff's impairment. (Tr. 55-57.) At the reconsideration level, Dr. David Biscardi and Dr. LaVerne Barnes reached the same conclusion. (Tr. 65-67.)

## Analysis

As part of his complaint, plaintiff asserts substantial evidence did not support the RFC assessment. A claimant's RFC is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). While an RFC determination is a legal decision for the ALJ, 20 C.F.R. § 404.1527(d), it must rest on an adequate evidentiary basis, *Murphy v. Colvin*, 759 F.3d 811, 317 (7th Cir. 2014). This basis can consist of medical or nonmedical evidence. *See id.*

ALJ Scurry determined plaintiff was capable of performing a full range of sedentary work. The Seventh Circuit has held, "a claimant can do sedentary work if he can (1) sit up, (2) do occasional lifting of objects up to ten pounds, and (3) occasionally walk or stand." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).

The ALJ's determination does not find support in the medical evidence. There is no RFC assessment from a medical source or any other medical opinion regarding plaintiff's ability to perform work-related activities. Both of the state-agency consultants concluded there was insufficient information to determine the severity of plaintiff's impairments. However, the ALJ assigned "little weight" to these opinions because "as of April 1994, records show the claimant adjusting to his limited respiratory status, having stabilized, and being active with activities of daily living." (Tr. 25.)

This is in reference to Dr. Belcher's April 1994 letter that stated plaintiff was "stabilized," "adjusting to his limited respiratory status," and "able to perform activities of daily living." (Tr. 611.) Simply because a claimant is characterized as "stable" or "improving" does not necessarily mean he is capable of performing sedentary work. *See Murphy*, 759 F.3d at 819. Moreover, Dr. Belcher gave no indication of what ADLs plaintiff could perform, and minimal daily activities do not establish that a claimant can engage in substantial physical activity. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Although the ALJ provided a summary of the medical record, he did not build a logical bridge between any other medical evidence and the requirements of sedentary work.

The ALJ's RFC determination finds no support in the non-medical evidence either. Plaintiff testified that, on a good day, he could perform a job that required him to sit, but he could never lift anything or walk more than a block. (Tr. 49.) The ALJ opined, "The claimant testified that he would need a job in which he could sit. . . . Therefore, the residual functional capacity limits the claimant to the full range of sedentary work." ALJ Scurry further opined, "The lack of treatment after mid-1994 and prior to the date last insured, the claimant's ability to

care for small children and carry out his ADLs, and the claimant's own testimony indicate that additional limitations are unwarranted." (Tr. 26.)

As a preliminary matter, plaintiff's testimony indicates he required additional limitations because he stated he could not lift anything and could only walk for a block. As stated in *Luna*, a full range of sedentary work requires lifting up to ten pounds and occasional walking. Although plaintiff did testify he could perform a job sitting down such as a secretary position, he stated he had bad days where he would be unable to work as a secretary. (Tr. 51.) The ALJ failed to address this portion of plaintiff's testimony. "This sound-bite approach to record evaluation is an impermissible methodology for evaluating the evidence." *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014). The ALJ's remaining analysis is also faulty.

The ALJ noted that plaintiff cared for his children during the relevant period. However, there is virtually no evidence in the record describing how plaintiff cared for his children. Similarly, although Dr. Belcher mentioned plaintiff engaged in ADLs, there is no indication of what these ADLs actually were. Finally, while infrequent treatment can be used to discredit a claimant's allegations, the ALJ "must not draw any inferences . . . unless the ALJ has explored the claimant's explanations as to a lack of medical care." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). The ALJ failed to develop the record regarding this evidence, and it was therefore improper to fill the evidentiary gaps by speculating. The Seventh Circuit Court of Appeals addressed a similar error in *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014).

In *Murphy*, the ALJ opined the claimant was less than credible because she testified she went on vacation. The Seventh Circuit found this inference problematic, explaining:

> The ALJ's assessment might have withstood scrutiny if, upon questioning Murphy and her husband, the ALJ found evidence that Murphy, for example, went on a whitewater rafting vacation, walked with lions in Africa, or ran with the

bulls in Spain. . . . Once again, we cannot assess the validity of the ALJ's determination because the record is devoid of information that might support her assessment and the ALJ did not ask follow-up questions that might prove insightful.

Similarly, here, the Court cannot assess whether plaintiff's ADLs, his ability to care for his children, or his lack of treatment constitute substantial evidence to support the RFC determination because the ALJ did not develop the record. Necessarily, the ALJ also failed to cite to any non-medical evidence to support the RFC assessment.

The RFC assessment was not only unsupported, but it was also not based on all of the relevant evidence in the record, as required under the relevant regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)(1)). The ALJ disregarded the VA's determination that plaintiff was 100% disabled because "their analysis and definition of disability differs from that under the Social Security Regulations and is of no value in determining disability under the Act." (Tr. 25.) This statement contradicts the Social Security Administration's (SSA) own ruling, which provides that "evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." SSR 06-03p, 2006 WL 2329939 (2006).[4] The Commissioner correctly points out that disability determinations from other agencies are not binding on the SSA. However, the Seventh Circuit Court of Appeals has said the "SSA should give the VA's determination of disability some weight." *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006). At a minimum, the ALJ had a duty to consider the VA's determination and articulate a valid reason for assigning it no weight. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ must articulate, at least minimally, his analysis of the evidence so that this court can follow his reasoning.").

---

[4] The SSA has adopted a new regulation, effective March 2017, stating, "we will not provide any analysis in our determination or decision about a decision made by any other governmental agency . . . ." Plaintiff's claim was filed in 2015 and, thus, the cited ruling still applies.

The ALJ failed to set forth any substantial evidence to support the RFC assessment and did not take into account all of the relevant information. Therefore, remand is required on this point alone, and plaintiff's remaining arguments will not be addressed. The Court wishes to stress that this Memorandum and Order should not be construed as an indication the Court believes plaintiff is disabled or should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
DATE: October 23, 2017

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**